[S.F. No. 22813.  In Bank.  Jan. 3, 1972.]

JESSE BALDWIN, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA, Defendant and Respondent.

## COUNSEL

Caldecott, Peck & Phillips and Edward F. Peck for Plaintiff and Appellant.

Robert E. Cartwright, Edward I. Pollock, Theodore A. Horn, Marvin E. Lewis, William H. Lally, Joseph W. Cotchett and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Appellant.

Harry S. Fenton, John P. Horgan, Robert J. DeFea, William R. Edgar, Robert R. Buell and William J. Turner for Defendant and Respondent.

Evelle J. Younger, Attorney General, and Robert L. Bergman, Deputy Attorney General, as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**SULLIVAN, J.**—This case presents the question whether a public entity retains its statutory immunity from liability for injury caused by the plan or design of a construction of, or an improvement to, public property where the plan or design, although approved in advance as being safe, nevertheless in its actual operation becomes dangerous under changed physical conditions. In *Cabell* v. *State of California* (1967) 67 Cal.2d 150

[60 Cal.Rptr. 476, 430 P.2d 34, 34 A.L.R.3d 1154] and *Becker* v. *Johnston* (1967) 67 Cal.2d 163 [60 Cal.Rptr. 485, 430 P.2d 43], we previously considered this problem and held that the design immunity remained intact even though changed circumstances had clearly revealed the defects of the plan. Upon reconsideration of this question, we are convinced that the Legislature did not intend that public entities should be permitted to shut their eyes to the operation of a plan or design once it has been transferred from blueprint to blacktop. We have, therefore, concluded that the above holding in *Cabell* and *Becker* should be overturned.

On August 28, 1967, at 4:25 p.m., plaintiff Jesse Baldwin was driving his Ford pickup truck in a northerly direction on Hoffman Boulevard, a four-lane state highway in the City of Richmond with a posted speed limit of 55 miles per hour. He intended to make a left turn onto Central Avenue, which crosses Hoffman Boulevard at right angles. Since Hoffman Boulevard had no special left-turn lane at this intersection, Baldwin stopped his truck in the inside or "fast" northbound lane to await a break in the oncoming traffic. While there stopped, his truck was struck from the rear by another northbound vehicle and knocked into southbound traffic, where it was hit head on. As a result of the collision plaintiff sustained severe personal injuries.

Plaintiff brought the present action for damages against the state and the rear-ending driver. His complaint set forth two counts against the state: the first, alleging that the rear-end collision was proximately caused by a dangerous condition of public property of which the state had actual notice a sufficient time prior to the accident to have taken measures to protect against the dangerous condition; the second count, incorporating almost all of the allegations of the first count and in addition alleging a failure of the state to warn plaintiff of such dangerous condition by installing signs, devices and markings on the roadway. On this appeal only the claim against the state is before us.

Essentially plaintiff's action against the state is grounded on section 835, subdivision (b), of the Government Code,[1] which provides that a public entity is liable for injury proximately caused by a dangerous condition of its property if the dangerous condition created a reasonably foreseeable risk of the kind of injury sustained and the public entity had actual or constructive notice of the condition a sufficient time before the injury to have taken preventive measures.[2] Plaintiff contends that the intersection at

[1]Hereafter, unless otherwise indicated, all section references are to the Government Code.

[2]Section 835, subdivision (b), provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of

Hoffman and Central constituted a dangerous condition for northbound motorists desiring to turn left onto Central because of the absence of a left-turn lane, the heavy traffic, and the high speeds on Hoffman Boulevard.[3]

Through documents attached as exhibits to answers to interrogatories posed by the state,[4] plaintiff established the following facts, which would amply support a finding that the intersection represented a dangerous condition, of which the state had actual and timely notice. In July 1961 the Richmond police submitted a report to the state Division of Highways which noted that of the 13 accidents at the Hoffman-Central intersection between January 1 and June 30, 1961, 7 were rear-end collisions caused by attempts to make left turns. Three months later, in October 1961, the Richmond traffic engineer advised the Division of Highways that this intersection accounted for 14 percent of all traffic fatalities in the city and that the injury-fatality rate for collisions there was double the rate for the rest of Richmond. The engineer's report revealed that in the preceding 3.7 years, 42 accidents occurred at the crossing, causing four deaths. The report estimated that 67 percent of the collisions might have been avoided by proper traffic signals.

In 1962 and 1963 three businesses located in a nearby industrial park wrote to the Division of Highways, describing serious accidents at the intersection and requesting corrective action. One of the firms stated that in the nine weeks during which its offices had been located in the area, eight collisions had taken place at the intersection. Another declared that two

---

the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that . . . . [Par.] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

[3]Of course the fact that any negligence by the state would not have resulted in injury to the plaintiff without the additional negligence of the driver who struck him from the rear is no defense to plaintiff's claim against the state. "If an injury is produced by the concurrent effect of two separate wrongful acts, each is a proximate cause of the injury, and neither can operate as an efficient intervening cause with regard to the other. [Citations.] The fact that neither party could reasonably anticipate the occurrence of the other concurrent cause will not shield him from liability so long as his own negligence was one of the causes of the injury. [Citations.]" (*Taylor* v. *Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 602 [110 P.2d 1044].) This principle has been applied even when one of the negligent parties is a governmental entity. (See *Callahan* v. *City and County of San Francisco* (1967) 249 Cal. App.2d 696, 701 [57 Cal.Rptr. 639]; *Chavez* v. *County of Merced* (1964) 229 Cal. App.2d 387, 395-396 [40 Cal.Rptr. 334].)

[4]The state admitted that the documents were genuine copies of originals contained in the files of the Division of Highways and that each was received or transmitted by the division on or about the date specified on the document.

of its employees had been involved in severe accidents there within the preceding four months. Soon thereafter, the Division of Highways notified the City of Richmond that it was restudying traffic conditions at the intersection and was considering constructing a physical barrier on Hoffman Boulevard to prevent turns onto Central Avenue. The city traffic engineer responded enthusiastically, but no barrier was erected.

In 1963 the Richmond City Council unanimously passed and sent to the Division of Highways a resolution urging the construction of an overpass at Hoffman and Central because of the "very high and critical rate of injury and fatality accidents." This request was repeated early in 1964 in a letter to the division by the local state assemblyman.

The record further tends to show that the hazardous nature of the intersection resulted from changed conditions—e.g., the large increase in traffic on Hoffman Boulevard since its construction in 1942. When the boulevard was designed, according to a declaration of an engineer for the Division of Highways, "there was very little development of the lands lying to the west of Hoffman Boulevard which were served by the roadway now known as Central Avenue and vehicular travel on said roadway to the west of Hoffman Boulevard was very light."

By February 1956 a traffic survey made by the City of Richmond showed that 1,440 vehicles per hour passed northbound through the intersection at rush hours. Because of the high incidence of accidents, left turns for *southbound* vehicles were prohibited in 1956. In September of that year the San Rafael-Richmond Bridge opened, further increasing traffic on Hoffman Boulevard, which is a main connecting highway to the bridge. By mid-1961, a state traffic survey indicated that 17,218 vehicles entered the intersection in an eight-hour period, an average of 2,152 per hour. An industrial park was developed at the west end of Central Avenue in 1961-1962, producing an even heavier traffic load and increasing the number of vehicles turning left off Hoffman Boulevard. By October 1963 a traffic count taken by the Division of Highways revealed that approximately 3,000 vehicles per hour passed through the intersection at peak traffic periods.

Despite this showing, the state moved for summary judgment on the ground that plaintiff's action was barred by section 830.6. That section provides that a public entity is immune from liability for injuries caused by the plan or design of a public improvement where such plan or design has been approved in advance by the legislative body of the public entity or by some other body or employee exercising discretionary authority and

where the court finds any substantial evidence on the basis of which a reasonable entity or employee could have approved the plan.[5]

Accompanying the motion for summary judgment were the declarations of two engineers who had worked for the California Division of Highways on the planning and construction of Hoffman Boulevard in the vicinity of the Central Avenue intersection. The declarations stated in substance as follows. The intersection was built in 1942 in accordance with two sets of plans. The first, which provided for construction of a graded roadbed, was approved March 11, 1942, by John H. Skeggs, then district engineer of district 04 of the Division of Highways, and on March 12, 1942, by C. H. Purcell, then state highway engineer of the division. The second plan, dealing with the paving of the roadbed, was approved by Skeggs on May 12, 1942, and by Purcell on May 14, 1942. Purcell, as state highway engineer, had discretionary authority to approve such plans on behalf of the state. The blueprints made no provision for a turning lane or for any traffic control devices at the intersection but freely permitted left turns from Hoffman Boulevard onto Central Avenue. Traffic conditions existing at the time of the preparation of the plans and anticipated in the future were not considered such as to warrant regulation or prohibition of left turns, or the installation of a turning lane. The blueprints for Hoffman Boulevard met then approved standards of the Division of Highways and then accepted highway engineering practices. The intersection was constructed in accordance with the above-described plans and conformed thereto in August 1967.

Plaintiff filed no declarations in opposition to the motion for summary judgment. The motion was granted and the complaint dismissed as to the state. This appeal followed.

From the foregoing summary of the state's declarations, it is clear that the state has presented facts sufficient to establish the initial applicability of an immunity under section 830.6. Plaintiff claims that the state's failure to provide a left-turn lane, coupled with the high speeds and heavy traffic on Hoffman Boulevard, constituted a dangerous condition. Yet the decla-

---

[5]Section 830.6 provides: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor."

rations of the Division of Highways employees establish without contradiction that the intersection was constructed in accordance with plans which made no provision for such a turning lane. ■ The declarations further show that the plans were approved in advance by the state highway engineer of the Division of Highways, who certainly qualifies as an "employee exercising discretionary authority to give such approval." (§ 830.6.) Finally, there is undoubtedly substantial evidence from which the trial judge could conclude that a reasonable employee could have approved the plan.

Consequently, *if* the rule of law is that design immunity, once having attached, is perpetually effective regardless of any subsequent change of conditions, the granting of a summary judgment in the instant case must be deemed proper, because the state established that it had a "good and substantial defense to the plaintiff's action . . ." and that no "triable issue of fact" remained. (Code Civ. Proc., § 437c.) The crucial question confronting us, therefore, is whether the immunity granted by section 830.6 continues to shield a public entity from liability even where, as here, the actual operation of the plan or design over a period of time and under changed circumstances discloses that the design has created a dangerous condition of which the entity has notice.

In *Cabell* v. *State of California, supra,* 67 Cal.2d 150 and *Becker* v. *Johnston, supra,* 67 Cal.2d 163, this court answered the above question in the affirmative. In *Cabell,* we held that section 830.6 immunized the state from liability arising from the breaking of a glass door which was installed and maintained according to state specifications even though the glass had shattered on three previous occasions causing personal injuries. In *Becker* we reached the same conclusion concerning a highway intersection designed in 1927, when " 'they also had horses and buggies . . .' " (67 Cal.2d at p. 173) using local roads, despite evidence of eight accidents in the four years preceding plaintiff's injury.

Essentially we must inquire as to whether the Legislature, in providing that design could give birth to immunity, intended that it could also endow immunity with perpetual life. (*Mannheim* v. *Superior Court* (1970) 3 Cal. 3d 678, 686 [91 Cal.Rptr. 585, 478 P.2d 17]; *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33].) In *Cabell* and *Becker* we were content to refer to the rationale of this immunity as explained by the California Law Revision Commission and to an excerpt from a publication for the Continuing Education of the Bar, authored by Professor Van Alstyne.[6] However, the analysis of the

---

[6]The statement of the Law Revision Commission was as follows: "There should be immunity from liability for the plan or design of public construction and improve-

Law Revision Commission did not touch upon the issue of the duration of design immunity. Furthermore, Professor Van Alstyne's views, although entitled to respect,[7] could not have been considered by the Legislature when it enacted section 830.6, since his work was published in 1964, one year *after* the adoption of that provision. Consequently, neither of these sources is useful in spotlighting legislative intent on this question.

---

ments where the plan or design has been approved by a governmental agency exercising discretionary authority, unless there is no reasonable basis for such approval. While it is proper to hold public entities liable for injuries caused by arbitrary abuses of discretionary authority in planning improvements, to permit reexamination in tort litigation of particular discretionary decisions where reasonable men may differ as to how the discretion should be exercised would create too great a danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested." (4 Cal. Law Revision Com. Rep. (1963) p. 823, quoted at 67 Cal.2d at p. 153.)

The excerpt from Professor Van Alstyne's book stated: "The reasonableness of adoption or approval of the design, plan, or standards is measured as of the time the adoption or approval occurred. A plan or design now judged to have been reasonable when adopted is not actionable even though its defective nature is considered wholly unreasonable under present circumstances and conditions." (Van Alstyne, Cal. Government Tort Liability (Cont.Ed.Bar 1964) p. 556, quoted at 67 Cal.2d at p. 153.)

[7]Professor Van Alstyne was the consultant to the California Law Revision Commission, which drafted section 830.6. It has been suggested, however, that this court may have misconstrued Professor Van Alstyne's comment. He may have meant, it is said, that if the public entity had no notice of the dangerous condition—e.g., because there had been no previous injuries—the reasonableness of the plan would be judged as of the time of adoption, even though expert testimony established that the plan was wholly unreasonable under present circumstances. (Note, *Sovereign Liability for Defective or Dangerous Plan or Design—California Government Code Section 830.6* (1968) 19 Hastings L.J. 584, 589, fn. 38.) Such an interpretation would be consistent with the rationale behind design immunity, which is to prevent a jury from simply reweighing the same factors considered by the governmental entity which approved the design. However, this rationale would be inapplicable where, as here, actual experience had demonstrated the dangerous nature of the design.

It is noteworthy, as the author of the Hastings Law Journal article points out, that elsewhere Professor Van Alstyne has suggested that the presence or absence of notice to the public entity may be the crucial factor in determining whether or not to impose liability. Writing on liability for failure to adopt safety regulations or precautions, he stated, "*In the absence of known physically dangerous or defective property conditions*—with respect to which negligent failures to remedy or warn have long been actionable under the Public Liability Act—it would seem that the New York court's reasoning constitutes a persuasive basis for rejecting liability for such inaction. To permit reexamination in tort litigation of such inaction, involving as it does a vast congeries of policy determinations at the legislative and planning levels, would appear to create too great a danger of impolitic interference with freedom of decision-making by those public officials in whom the function of making such decisions has been vested." (5 Cal. Law Revision Com. Rep. (1963) pp. 442-443.) (Italics added.)

Thus, in the sphere of liability for failure to enact appropriate safety regulations, Professor Van Alstyne suggests that to impose liability would disrupt official decision-making, and consequently there should be immunity for such inaction—"in the

Upon further examination of the question we are of the view that the Legislature's intent with respect to the continuance of the immunity under changed conditions is clear, and that such intent is directly contrary to the interpretation adopted in *Cabell* and *Becker*. Section 830.6 was drafted by the California Law Revision Commission in 1963 as part of its comprehensive study of governmental tort liability and sovereign immunity, and was enacted by the Legislature without change. The official comment of the commission, which was formally adopted as indicating legislative intent by the Senate Committee on the Judiciary and the Assembly Committee on Ways and Means (2 Sen. J. (1963) p. 1885; 3 Assem. J. (1963) p. 5439), declares in pertinent part: "The immunity provided by Section 830.6 is similar to an immunity that has been granted by judicial decision to public entities in New York. See *Weiss* v. *Fote,* 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960)."

In *Weiss* the plaintiff contended that the City of Buffalo was liable for the injuries she had sustained when struck by an automobile because of the city's negligence in allowing too short a "clearance interval" between traffic lights at an intersection. The evidence showed that the lights had been designed by a city agency after an extensive study of traffic conditions and that no other accident had occurred at that intersection in the three years since their installation. *Under these circumstances,* the court held that to allow a jury to pass on the reasonableness and safety of public improvements which had been planned and approved by a governmental body would obstruct normal governmental operations and "place in inexpert hands what the Legislature has seen fit to entrust to experts." (7 N.Y.2d at p. 586.)

However, the New York court emphasized that the immunity for plan or design was far from absolute. Distinguishing an earlier decision, the court outlined the sharp restrictions on the design immunity doctrine in New York: "[I]n *Eastman* v. *State of New York* (303 N.Y. 691 [103 N.E.2d 56]), although the suit seems to have been predicated, in part, on the State's negligence in planning an intersection without a stop sign, our affirmance rested on an entirely different theory. The court's decision simply reflected the rule that, once having planned the intersection, the State was under a continuing duty to review its plan in the light of its actual operation and that the proof established a breach of such duty.

absence of known physically dangerous or defective property conditions." Where the public entity knows of the hazardous condition, apparently Professor Van Alstyne would impose liability for its inaction. Since the same rationale—interference with discretionary decision-making—is used to justify the immunity for design, logically that immunity should remain only "in the absence of known physically dangerous or defective property conditions."

More particularly, the court considered, as sufficient to demonstrate a violation of the State's continuing obligation to maintain the safety of the highways, evidence that physical conditions had changed at the intersection and that a number of accidents had occurred after the stop sign had been removed. In the case before us, however, the situation is quite different; there is no showing that the continuing obligation which rested on the municipality was violated. There is no proof either of changed conditions or of accidents at the intersection which would have required the city to modify the signal light 'clearance interval.' In point of fact, it appeared that the signal lights had operated for upwards of three years, with an estimated 1,521,705 traffic changes, without evidence of a single accident." (7 N.Y. 2d at pp. 587-588.)

The clear teaching of *Weiss* is that design immunity persists only so long as conditions have not changed. Having approved the plan or design, the governmental entity may not, ostrich-like, hide its head in the blueprints, blithely ignoring the actual operation of the plan. ■ Once the entity has notice[8] that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act reasonably to correct or alleviate the hazard. Since the Legislature explicitly adopted the rule of *Weiss,* we conclude that it did not intend that the design immunity provided by section 830.6 would be perpetual. Our view is shared by legal commentators. (See Knudson, *An Unusual Defense Available to Public Entities in the Area of the Maintenance of Dangerous Conditions on Public Property* (1970) 4 U.S.F.L.Rev. 442, 449-451; Chotiner, *California Government Tort Liability* (1968) 43 State Bar J. 233, 238-239; Note, *The Supreme Court of California* 1967-1968 (1968) 56 Cal.L.Rev. 1612, 1758-1759; Note, *supra,* 19 Hastings L.J. 584, 587-590.)

Our holding today is consonant not only with the intention of the Legislature but also with the purpose of design immunity. ·■ We think that in enacting section 830.6, the Legislature was concerned lest juries be allowed to second-guess the discretionary determinations of public officials by reviewing the identical questions of risk that had previously been considered by the government officers who adopted or approved the plan. ■ As the New York Court of Appeals stated in *Weiss* v. *Fote, supra*:

---

[8]Such notice may be actual or constructive and must be a sufficient time prior to the injury to have permitted the public entity to take measures to protect against the danger. (§ 835, subd. (b).) A public entity has actual notice if it has actual knowledge of the existence of the condition and knew or should have known of its dangerous character. (§ 835.2, subd. (a).) It has constructive notice if the plaintiff establishes that the condition had existed for a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its hazardous nature. (§ 835.2, subd. (b).)

"We are of the opinion that the traditional reliance on a jury verdict to assess fault and general tort liability is misplaced where a duly authorized public planning body has entertained and passed on the very same question of risk as would ordinarily go to the jury." (7 N.Y.2d 579, 588.)

However, where experience has revealed the dangerous nature of the public improvement under changed physical conditions, the trier of fact will not simply be reweighing the same technical data and policy criteria which went into the original plan or design. Rather, there will then be objective evidence arising out of the actual operation of the plan—matters which, of necessity, could not have been contemplated by the government agency or employee who approved the design. No threat of undue interference with discretionary decision-making exists in this situation.

This view is bolstered by a recent report of the Law Revision Commission which explicitly disapproves *Cabell* and *Becker* and urges new legislation to overrule those decisions. Indeed the proposed legislation would be even broader than our holding in the instant case and would eliminate design immunity where previous injuries have demonstrated the existence of a dangerous condition which has been made known to the public entity. (9 Cal. Law Revision Com. Rep. (1969) p. 816.) The report states that the immunity conferred by section 830.6 should be continued only to the extent that it provides immunity for the initial discretionary planning decision. "As a matter of simple justice, however, the immunity should be considered to have terminated when the court finds that (1) the plan or design, as effectuated, has actually resulted in a 'dangerous condition' at the time of an injury, (2) prior injuries have occurred that demonstrated that fact, and (3) the public entity has had knowledge of these prior injuries and a reasonable time to protect against the dangerous condition." (*Id.* at p. 819.) Although this new report was obviously not before the Legislature when it enacted section 830.6 in 1963, we find it significant that this new recommendation was prepared by the same body which drafted section 830.6.

Finally, we think that our present construction of section 830.6 more accurately reflects the considerations of public policy which have guided judicial interpretations of governmental tort immunity since our decision in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal. Rptr. 89, 359 P.2d 457]. In *Muskopf,* we abrogated the common law rule of governmental immunity, observing that "when there is negligence, the rule is liability, immunity is the exception." (*Id.* at p. 219.) Our decisions since the adoption of the Tort Claims Act of 1963 (§§ 810-996.6) have adhered to this basic axiom of tort law. Thus, we have pointed out

that "courts should not casually decree governmental immunity . . ." (*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 798 [73 Cal.Rptr. 240, 447 P.2d 352]), and that "[u]nless the Legislature has clearly provided for *immunity,* the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail." (*Ramos* v. *County of Madera* (1971) 4 Cal.3d 685, 692 [94 Cal.Rptr. 421, 484 P.2d 93].)[9] (Italics added.) Since, as we have outlined above, the Legislature has clearly provided for *liability* where the public entity permits continued dangerous operation of a public improvement in the face of changed conditions we would frustrate both its intention and public policy if we followed *Cabell* and *Becker.*

We are met, however, by the contention that a narrow interpretation of design immunity will bankrupt public entities by forcing them to spend vast sums of money to update hazardous or obsolescent public improvements. We unhesitatingly reject this contention because we find that the Legislature has adequately protected public entities against crippling financial burdens.

The prime example of such statutory limitation on governmental liability is section 835.4, which provides that even if a plaintiff proves the existence of a dangerous condition under section 835, the public entity may avoid liability if it establishes that "the action it took to protect against the risk of injury created by the condition or its failure to take such action was reasonable." The reasonableness of the action or inaction by the government body is to be determined "by taking into consideration the time and opportunity it had to take action and by weighing the probability and gravity of potential injury to persons and property foreseeably exposed

---

[9]These cases support today's holding for another reason. In *Johnson* and *Ramos* we were interpreting section 820.2, which provides immunity to a public employee for injury arising from acts or omissions which resulted from the exercise of discretion vested in him. Exploring the boundaries of the immunity for such discretionary decision-making, we distinguished between the "planning" or "basic policy" level of decision-making, for which there is immunity, and the "operational" or "ministerial" implementation, for which there is not. The rationale for granting immunity for basic policy decisions is to avoid placing courts "in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government." (*Johnson* v. *State of California, supra,* 69 Cal.2d 782, 793.) When public officials are merely carrying out these policy decisions, judicial inquiry into their conduct does not pose the same threat of interference with the machinery of the other branches of government. Therefore, no immunity is warranted.

This distinction is also applicable to the immunity for plan or design provided by section 830.6. The purpose of that immunity is to keep the judicial branch from reexamining the basic planning decisions made by executive officials or approved by legislative bodies. However, supervision of the design after it has been executed is essentially operational or ministerial. Consequently, it is consistent to find liability for negligence at that level when, as in the instant case, the actual operation of the planning decision is examined in the light of changed physical conditions.

to the risk of injury against the practicability and cost of protecting against the risk of such injury." (§ 835.4.) The balancing process provided by this section shields the entity from liability where it is shown that "it would have been too costly and impractical for the public entity to have done anything else." (Cal. Law Revision Com. comment.) It is significant that in the instant action, the state admitted that the cost to it of installing a left-turn lane at the intersection would not have exceeded $20,000.[10]

Furthermore, even where corrective action is clearly indicated, extensive and costly rebuilding programs are by no means required. A public entity is liable under section 835, subdivision (b), only if it fails to "protect against" dangerous conditions of which it had notice. Section 830, subdivision (b), defines "protect against" to include "repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition." In many cases, inexpensive remedies, such as warning signs, lights, barricades or guardrails, will be sufficient. In the case at bench, for example, simply erecting a barrier to prohibit left turns by northbound motorists at the Hoffman-Central intersection would have prevented plaintiff's accident. As noted above, such a remedy was considered by the Division of Highways but never implemented.

Past experience in California and other jurisdictions also indicates that a limited interpretation of design immunity will hardly wreak financial havoc on public entities. Until the passage of section 830.6 in 1963, California law made no provision for such an immunity. Yet for 40 years before that, under the Public Liability Act of 1923, cities, counties, and school districts were liable for dangerous conditions of their property,[11] and liability could be imposed on all other public entities for dangerous conditions of property devoted to a "proprietary" function. (*Brown* v. *Fifteenth Dist. Agr. Fair Assn.* (1958) 159 Cal.App.2d 93 [323 P.2d

---

[10]According to the state's answers to the interrogatories submitted by plaintiff, a left-turn lane and traffic signals were installed at the Hoffman-Central intersection shortly after plaintiff's accident. Construction of the improvements was begun in November 1967, three months after this collision, and completed in April 1968. However, this fact is not admissible to show that the crossing was a dangerous condition at the time of the injury. (§ 830.5.)

[11]Former section 53051 of the Government Code, which was repealed in 1963 upon the enactment of the new Tort Claims Act, provided: "A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition: [Par.] (a) Had knowledge or notice of the defective or dangerous condition. [Par.] (b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition." The term "local agency" was defined in section 53050 to mean "city, county or school district."

131].) Furthermore, other populous states, such as New York and Illinois, recognize an initial design immunity but permit liability where later experience has demonstrated the dangerous nature of the public improvement. (*Weiss* v. *Fote, supra,* 7 N.Y.2d 579; Ill. Ann. Stats., ch. 85, § 3-103 (Smith-Hurd 1966)[12].) No fiscal disaster appears to have resulted from the earlier California or the present New York and Illinois rules.

◼ Finally, despite the immunity provided by section 830.6, article I, section 14 of the state Constitution subjects all public entities in California to liability under an inverse condemnation theory for injury to *property* caused by public works. (9 Cal. Law Revision Com. Rep., *supra,* pp. 816, 821-822.) It provides, in part: "Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into courts for, the owner, . . ." Construing this section, we recently stated, "[A]ny actual physical injury to . . . property proximately caused by the improvement *as deliberately designed and constructed* is compensable under article I, section 14, of our Constitution, whether foreseeable or not." (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 263-264 [42 Cal.Rptr. 89, 398 P.2d 129].) (Italics added.) Since this provision is of constitutional stature, it overrides the statutory immunity under section 830.6. (See Van Alstyne, *op. cit. supra,* at p. 556.) Consequently, where property is involved, a public entity is already under a continuing obligation to review the design of its public works in order to avoid liability imposed by article I, section 14. No insuperable additional burden is placed upon such an entity by extending this duty to cases of personal injury.

◼ To recapitulate, we hold that where a plan or design of a construction of, or improvement to, public property, although shown to have been reasonably approved in advance or prepared in conformity with standards previously so approved, as being safe, nevertheless in its actual operation under changed physical conditions produces a dangerous condition of public property and causes injury, the public entity does not retain the statutory immunity from liability conferred on it by section 830.6.[13] To the

[12]The Illinois statute provides for design immunity, but contains the following proviso: "The local public entity is liable, however, if after the execution of such plan or design it appears from its use that it has created a condition that is not reasonably safe."

[13]In view of our holding, we need not consider plaintiff's alternative arguments that the immunity provided by section 830.6 applies only to actions based on subdivision (a) of section 835, not to those based on subdivision (b); that despite the immunity for design, the state is liable because it could foresee the negligence of the driver who struck plaintiff from the rear; and that the state had an obligation to warn of the dangerous condition.

Nor do we reach the contention raised by amici that there is no immunity as to

extent that they are inconsistent with our ruling here, *Cabell* v. *State of California, supra,* 67 Cal.2d 150 and *Becker* v. *Johnston, supra,* 67 Cal.2d 163 are overruled.

Bearing in mind the legal concepts which we have outlined above, we turn to consider whether the trial court correctly granted summary judgment for defendant state. We have stated the general principles governing summary judgment procedure on several occasions and need not repeat them at length here. (See *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852 [94 Cal.Rptr. 785, 484 P.2d 953]; *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 146-148 [60 Cal.Rptr. 377, 429 P.2d 889]; *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 498 P.2d 785].) For present purposes, we need be concerned only with the rule governing the sufficiency of the affidavits or declarations submitted by a party moving for summary judgment. This rule may be briefly summarized as follows. The movant's affidavits must state facts sufficient to establish each element necessary to sustain a judgment in his favor. Unless they do, summary judgment should be denied, even though the opposing party files no affidavits whatsoever. (*de Echeguren* v. *de Echeguren* (1962) 210 Cal. App.2d 141, 147 [26 Cal.Rptr. 562]; *Snider* v. *Snider* (1962) 200 Cal. App.2d 741, 748 [19 Cal.Rptr. 709]; Code Civ. Proc., § 437c.)

It is clear that the declarations submitted in support of the state's motion in this case were insufficient to warrant entry of summary judgment. As we have previously stated, these declarations contain facts amply demonstrating the *initial* applicability of the design immunity provided by section 830.6. However, understandably relying upon *Cabell* and *Becker,* the state failed to make any showing whatsoever on the crucial issue of whether the immunity remains. Since, as we now hold, the planning immunity may be dissolved by evidence that the plan or design under changed physical conditions has produced a dangerous condition, it was incumbent upon the state to present facts indicating that the immunity is still intact. In the absence of such a showing, the state as moving party, has not established all elements necessary to sustain a judgment in its favor. (See Civil Procedure Before Trial (Cont. Ed. Bar 1957) p. 862; *Hayward Union etc. School Dist.* v. *Madrid* (1965) 234 Cal.App.2d 100,

---

the maintenance of public property and that the liability of the public entity can be grounded not on any error in the *adoption* of the plan but on the negligent *maintenance* of the public property. (See, for example, *Booth* v. *District of Columbia* (1956) 241 F.2d 437 [100 App.D.C. 32]; *Paul* v. *Faricy* (1949) 228 Minn. 264 [37 N.W.2d 427]; *Perrotti* v. *Bennett* (1920) 94 Conn. 533 [109 A. 890]; *Malloy* v. *Township of Walker* (1889) 77 Mich. 448 [43 N.W. 1012, 1016].)

120 [44 Cal.Rptr. 268].) Consequently, the entry of summary judgment was erroneous.

The judgment is reversed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

Respondent's petition for a rehearing was denied February 2, 1972.