[No. C040665. Third Dist. Aug. 7, 2003.]

ROUSHON MIRZADA et al., Plaintiffs and Appellants, v.
DEPARTMENT OF TRANSPORTATION, Defendant and Respondent.

**COUNSEL**

Thomas B. Kidwell & Associates and Thomas B. Kidwell for Plaintiffs and Appellants.

Bruce A. Behrens, Brelend C. Gowan, Richard A. Wehe, Gary A. Geren and Kevin M. Corrington for Defendant and Respondent.

OPINION

**NICHOLSON, J.**—Plaintiffs brought this personal injury and wrongful death tort action against the Department of Transportation (Caltrans) after a drunk driver crossed the median on Interstate 5 and collided with them. They assert Caltrans should be held liable because, at the time of the accident, it had not installed a barrier in the median. While they concede Caltrans, at one time, enjoyed immunity for the design at the accident site, they contend Caltrans lost that immunity because the design had become dangerous as a result of changed physical conditions. We conclude, as did the trial court when it granted summary judgment in favor of Caltrans, that the evidence does not support plaintiffs' contention.

## BACKGROUND CONCERNING MEDIAN BARRIERS

"Median barriers result in a trade-off. They prevent nearly all cross-median accidents, but usually result in an overall increase in accidents and injuries. A median barrier is a fixed object which, when hit, can cause serious injury either by direct impact or by deflecting vehicles back into traffic. In addition, a barrier eliminates half the recovery area for out-of-control vehicles. Based on studies of the effectiveness of median barrier placement, California has developed a median barrier policy. The policy reflects the fact that as traffic volumes rise, the chance that an errant vehicle will cross the median and strike an opposing vehicle increases. But as the median reaches a certain width, it is less likely that those events will occur. With medians 46 feet or wider, regardless of traffic volume, the benefits of preventing cross-median accidents and injuries by barrier placement are outweighed by the disadvantages of the accidents and injuries generated by a barrier. The only exception to this rule is at those locations where there is a demonstrable history of excessive cross-median accidents: an accident rate of 0.12 fatal or 0.50 total cross-median accidents per mile per year.

"The State policy—median barriers should be installed on freeways only if the result of striking the barrier is less severe than the result if no barrier existed—is reflected in median barrier warrants. There are two types of warrants, traffic volume/median width warrants (traffic volume/width warrants) and accident warrants. Traffic volume/width warrants index traffic volume to median width. Accident warrants index the frequency and severity of traffic accidents at a given locale with a state average.... ' ... The fact that a "warrant" for a particular traffic control or safety device is met is not conclusive justification for the installation of the device. The unique circumstances of each location and the amount of funds available for highway improvements must be considered in determining whether or not to install a traffic control or safety device.' [¶] ... [¶]

"When a freeway is built without a median barrier, the State monitors it annually to determine whether subsequent placement of a median barrier may result in a safety benefit. Each year, through its Median Barrier Monitoring System, a 'sophisticated computer program,' the State reviews the entire State highway system and identifies those locations that meet the accident warrant and the traffic volume/width warrant. The State notifies each district of the road segments in its area that met either warrant based on data collected the previous year. The district engineers conduct detailed reviews and field investigations and recommend to the State whether or not a barrier should be installed at the identified locations. The State reviews the district recommendations for statewide uniformity and availability of funding and makes a final decision with the district regarding installation of a median barrier at the identified locations." (*Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 724–726 [95 Cal.Rptr.2d 719].)

## FACTS

The following facts are contained in the parties' separate statements of undisputed and disputed facts.

In the early morning on August 2, 1998, Leobardo Suarez, while intoxicated, was driving a Chevrolet pickup truck southbound on Interstate 5, south of Stockton. He crossed the 60-foot barrierless median and, traveling southbound in the northbound lanes, collided head on with a BMW sedan occupied by the Mirzada family. The accident occurred at post mile 16.61. Najibullah Mirzada, Roushon Mirzada, Manush Mirzada, Abdul Ghaffar Mirzada, and Abdul Jabbar Mirzada were injured in the accident. Five-year-old Mirwaice Mirzada died.

The segment of Interstate 5 where the accident occurred was designed during 1966 to 1969 and constructed during 1970 to 1972 (hereafter, the 1972 project). It was designed and constructed without a median barrier. At the time of this project, Caltrans policy was to install median barriers only if the width of the median was less than 46 feet. The average daily traffic at post mile 16.61 increased from 21,000 vehicles in 1972 to 69,000 vehicles in 1998.

In 1997, Caltrans changed the warrants for installation of median barriers so that medians up to 75 feet wide could be considered for barriers depending on traffic volume and median width characteristics alone. In January 1998, Caltrans recommended a $1.6 million project to install 12 miles of median barriers along Interstate 5, including at post mile 16.61. The barrier was not constructed before the August 1998 accident.

Additional facts will be recited as they become relevant.

## DISCUSSION

"A public entity is liable for injury proximately caused by a dangerous condition of its property if the dangerous condition created a reasonably foreseeable risk of the kind of injury sustained, and the public entity had actual or constructive notice of the condition a sufficient time before the injury to have taken preventive measures. (Gov. Code, § 835, subd. (b); *Baldwin v. State of California* (1972) 6 Cal.3d 424, 427 [99 Cal.Rptr. 145, 491 P.2d 1121] (*Baldwin*).)

"However, a public entity may avoid such liability by raising the affirmative defense of design immunity. ([Gov. Code,] § 830.6.) A public entity claiming design immunity must establish three elements: (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design. [Citations.]

"Design immunity does not necessarily continue in perpetuity. (*Baldwin, supra,* 6 Cal.3d at p. 434.) To demonstrate loss of design immunity a plaintiff must also establish three elements: (1) the plan or design has become dangerous because of a change in physical conditions; (2) the public entity had actual or constructive notice of the dangerous condition thus created; and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or the public entity, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably attempted to provide adequate warnings. ([Gov. Code,] § 830.6; *Baldwin,* at p. 438.)" (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 66 [109 Cal.Rptr.2d 1, 26 P.3d 332] (*Cornette*), fn. and italics omitted.)

At trial, after a defendant has shown the applicability of the design immunity to the plaintiff's claims, the plaintiff bears the burden of establishing each of the three elements of the loss of the immunity. (*Cornette, supra,* 26 Cal.4th at p. 72.) Here, plaintiffs do not dispute the existence of the elements establishing the design immunity. They argue, instead, that the immunity was lost.     ■     Consistent with their burden at trial of establishing the elements of Caltrans's loss of the design immunity, plaintiffs bore the burden of production in opposition to the motion for summary judgment "to make a prima facie showing of the existence of a triable issue of material fact" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493]) with respect to the loss of the design immunity. Since it is necessary to establish all three elements of the loss of the design immunity (*Cornette, supra,* 26 Cal.4th at p. 66), plaintiffs needed

to make a prima facie showing of the existence of a triable issue of fact with respect to each of those elements to overcome Caltrans's motion for summary judgment.

Citing *Baldwin, supra*, 6 Cal.3d at page 439, plaintiffs assert Caltrans, in support of its motion for summary judgment, bore the burden of establishing there were no triable issues of material fact relating to the loss of the design immunity. While this may have been the state of the law in 1972, when the Supreme Court decided *Baldwin*, the law concerning summary judgments changed in 1992 and 1993 to provide for a shift in the burden of production in cases such as this in which the moving defendant establishes the existence of an affirmative defense—here, the design immunity. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at pp. 851–852.) Accordingly, we must determine whether plaintiffs successfully produced evidence establishing a triable issue of material fact concerning whether Caltrans lost the design immunity, including whether (1) the design became dangerous because of a change in physical conditions; (2) Caltrans had actual or constructive notice of the dangerous condition thus created; and (3) Caltrans had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or Caltrans, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably attempted to provide adequate warnings. (Gov. Code, § 830.6; *Cornette, supra*, 26 Cal.4th at p. 66.)

In their opposition to the motion for summary judgment, plaintiffs asserted the following four disputed facts in support of their contention the 1972 project design had become dangerous due to changed conditions:

"A. The [average daily traffic] for the subject accident site in [*sic*] increased from 21,000 vehicles in 1972 to 69,000 vehicles in 1998."

"B. The [*sic*] was a substantial increase in cross-median accidents in freeway medians wider than 45 feet after 1991 due to changes in the driving population, vehicle designs, speed limits, driver skills and driver attitudes."

"C. Between 1992 and 1996, there were more than 26 cross-median accidents segment [*sic*] of Highway 5 in the vicinity of Plaintiffs' accident and the subject segment of Highway 5 met the accident warrant criteria for installation of a median barrier set forth under Caltrans['s] existing policy."

"D. As a result of the high number of cross-median accidents and the high volume of traffic, the segment of Highway 5 in the vicinity of Plaintiffs' accident was scheduled for installation of a median barrier under a Caltrans project which had the highest priority rating."

Beginning our analysis with the last fact asserted, we disregard the fact that Caltrans scheduled installation of a median barrier in an area which included plaintiffs' accident site. Such evidence does not constitute an admission that the lack of a barrier created a dangerous condition or that the conditions had changed in a way that ended the design immunity. (*Alvarez v. State of California, supra,* 79 Cal.App.4th at p. 739.)

Caltrans did not dispute plaintiffs' fact A. Thus, the average daily traffic at the accident site increased from 21,000 in 1972 to 69,000 in 1998. ■ An increase in traffic alone, however, is insufficient to establish the loss of the design immunity. Without more, an increase in traffic proves nothing. (*Higgins v. State of California* (1997) 54 Cal.App.4th 177, 188 [62 Cal.Rptr.2d 459].) Here, the evidence showed that, despite the increase in traffic, it remained within the design capacity of the freeway.

Caltrans also did not dispute plaintiffs' fact B, which avers that accidents across medians more than 45 feet wide have increased since 1991 for a variety of reasons. This abstract and general statement is likewise insufficient to establish a changed condition at the accident site, let alone a dangerous condition. To conclude otherwise would virtually eliminate the design immunity throughout the state where there is no median barrier. Certainly, traffic on the established freeways has increased along with the population. However, a statement of a general fact such as fact B does not establish that the accident rate at this particular site has increased. Furthermore, it is unknown how this fact concerning medians more than 45 feet wide applies to a median such as this that is substantially wider, at 60 feet. "[E]vidence of changed conditions must be evidence that physical conditions at a specific location have changed in such a manner that the original design has created a dangerous condition of which the entity has notice." (*Dole Citrus v. State of California* (1997) 60 Cal.App.4th 486, 494 [70 Cal.Rptr.2d 348].)

The last remaining fact plaintiffs asserted in support of a finding the accident site had become dangerous because of changed physical conditions is plaintiffs' fact C, which is, in reality, an assertion of two separate facts: (1) between 1992 and 1996 there were more than 26 cross-median accidents within the vicinity of the accident site and (2) the accident site met the accident warrant criteria for installation of a median barrier. As evidence supporting these asserted facts, plaintiffs cited a Caltrans report prepared on December 24, 1997, which appears to reflect that over the prior five years there were 26 cross-median accidents in 10.19 miles of noncontiguous freeway (two separate contiguous stretches) which included post mile 16.61, the site of plaintiffs' accident. The report indicated there were .51 accidents per mile per year and .02 fatal accidents per mile per year in the area covered by the report.

Caltrans responded to this evidence by objecting that it was irrelevant and lacked foundation. Caltrans noted that most of the freeway included in the report cited by plaintiffs was not included in the original 1972 project for which the design immunity applied. There were no cross-median accidents in the relevant area of the original 1972 project, a 2.8-mile stretch from post mile 16.50 to post mile 19.30, during the five years before plaintiffs' accident. Furthermore, the cross-median accident closest to plaintiffs' accident site within the five years preceding plaintiffs' accident was at post mile 20.16, 3.55 miles away. Caltrans's expert Richard Smith calculated these numbers from the state's automated Traffic Accident Surveillance Analysis System (TASAS) and California Highway Patrol collision reports.

Stating there were more than 26 cross-median accidents "within the vicinity of the accident site," plaintiffs were intentionally vague. In the face of Caltrans's evidence showing that, in the five years prior to plaintiffs' accident, there were no cross-median accidents in the 1972 project area, upon which the design immunity was based, or within 3.55 miles of the site of plaintiffs' accident, plaintiffs' general evidence that there were more than 26 cross-median within the "vicinity" of the accident site did not raise a triable issue of fact concerning whether the design became dangerous because of a change in physical conditions.[1] ■ In the face of specificity, generalities do not overcome a motion for summary judgment.

These are the four "facts" listed by plaintiffs in support of their contention the design had become dangerous due to a change in physical conditions. On appeal, they add a fact to this list:

"H. There is no significant change in the roadway geometry between the area immediately south of the accident site and the area extending north of the accident site which has a greater volume of traffic. Therefore it was foreseeable that cross-median accident [sic] were more likely to occur north of mile post [sic] 16.50 than south of that point."

In the trial court, plaintiffs listed this fact in support of their claim that Caltrans was on actual or constructive notice that the design had become dangerous, but not in support of their claim that the design had become dangerous due to changed physical conditions. In any event, it does not bolster their case on appeal.

---

[1] Caltrans disputes the accuracy of the Caltrans report upon which plaintiffs relied in stating there were 26 cross-median accidents in the "vicinity" of plaintiffs' accident. Because of our conclusion that Caltrans's more specific evidence that there were no accidents within 3.55 miles of the accident site within five years before the accident overcomes plaintiffs' vague and general assertion of fact concerning cross-median accidents in the "vicinity," we need not determine whether we can resolve, on review of a motion for summary judgment, Caltrans's assertion that the report upon which plaintiffs rely was inaccurate.

Plaintiffs assert that fact H, which is based on a statement made in the declaration of plaintiffs' expert, "was relevant to show that the accident history of the area to the north of the site of [plaintiffs'] accident was applicable because of the similarity of the of the [*sic*] road condition, traffic volume and road geometry." As with plaintiffs' other assertions of fact, this asserted fact is too general, in the face of defendant Caltrans's specific evidence concerning the accident site, to be material in determining whether the design had become dangerous due to changed physical conditions. Fact H refers to "the area extending north of the accident site." It does not state, however, how far north the area of comparison extends. Additionally, plaintiff fails to present facts concerning how many cross-median accidents had occurred in this unspecified "area extending north." Finally, this asserted fact speaks to the area south of the accident site and the area north of the accident site, but it does not, on its face, say anything about the accident site itself. The ambiguities inherent in these general statements made it impossible for the trial court to rely on the statements to deny summary judgment.

Plaintiffs failed to produce evidence establishing a triable issue of material fact concerning whether the design had become dangerous due to changed physical conditions.[2] This defeats their arguments that the trial court erred in granting summary judgment to Caltrans, even without a discussion concerning whether Caltrans was on actual or constructive notice of a dangerous condition and whether there was sufficient time and means to install a median or warn about a danger. Indeed, it would be baseless and superfluous to discuss those two elements of the loss of the design immunity in light of our conclusion that the facts presented by the parties in their statements of undisputed and disputed facts lead only to the conclusion the design did not become dangerous due to a change in physical conditions. Accordingly, we end our analysis here.[3]

## DISPOSITION

The judgment is affirmed.

Davis, Acting P. J., and Kolkey, J., concurred.

A petition for a rehearing was denied September 3, 2003, and appellants' petition for review by the Supreme Court was denied November 12, 2003.

---

[2] In their opening brief, plaintiffs state that counsel, at the hearing on the motion for summary judgment, argued additional facts concerning whether the design had become dangerous due to changed physical conditions. It was incumbent upon plaintiffs to list these facts, with supporting evidence, in their statement of disputed facts. (Code Civ. Proc, § 437c, subd. (b).)

[3] Having considered the materiality of the facts asserted by plaintiffs in opposition to the motion for summary judgment, we need not determine whether the trial court's additional rulings concerning the admissibility of plaintiffs' evidence were correct.