# IN THE SUPREME COURT OF CALIFORNIA

BETTY TANSAVATDI,
Plaintiff and Appellant,

v.

CITY OF RANCHO PALOS VERDES,
Defendant and Respondent.

S267453

Second Appellate District, Division Four
B293670

Los Angeles County Superior Court
BC633651 and BC652435

---

April 27, 2023

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Jenkins, and Evans concurred.

---

TANSAVATDI v. CITY OF RANCHO PALOS VERDES

S267453

Opinion of the Court by Groban, J.

Under the Government Claims Act (Gov. Code, § 810 et seq.), a public entity can be held liable for either creating a dangerous condition on its property (*id*., § 835, subd. (a)) or failing to protect against such a condition when the entity had notice of the danger and sufficient time to remedy the situation (*id*., subd. (b)). The statutory defense of design immunity, however, precludes liability for injuries that were allegedly caused by a defect in the design of a public improvement when certain conditions are met. (*Id*., § 830.6.) To obtain design immunity, a public entity must establish that the challenged design was discretionarily approved by authorized personnel and that substantial evidence supported the reasonableness of the plan. (*Cornette v. Dept. of Transportation* (2001) 26 Cal.4th 63, 66 (*Cornette*).)

The question presented in this case is whether design immunity bars all forms of claims that seek to impose liability for injuries resulting from a dangerous feature of a roadway. More specifically, we must determine whether design immunity is limited to claims alleging that a public entity *created* a dangerous roadway condition through a defective design, or whether the statutory immunity also extends to claims alleging that a public entity *failed to warn* of a design element that resulted in a dangerous roadway condition.

1

Relying on our holding in *Cameron v. State of California* (1972) 7 Cal.3d 318 (*Cameron*), we conclude that design immunity does not categorically preclude failure to warn claims that involve a discretionarily approved element of a roadway. As we expressly held in *Cameron*, "[W]here the state is immune from liability for injuries caused by a dangerous condition of its property because the dangerous condition was created as a result of a plan or design which conferred immunity under [Government Code] section 830.6, the state may nevertheless be liable for failure to warn of this dangerous condition." (*Cameron,* at p. 329.) The effect of *Cameron* is that while section 830.6 shields public entities from liability for injuries resulting from the design of the physical features of a roadway, they nonetheless retain a duty to warn of known dangers that the roadway presents to the public.

The City of Rancho Palo Verdes (the City), however, argues that *Cameron* is poorly reasoned and should be overruled. The City contends that *Cameron*'s "illogical" holding gravely undermines the design immunity defense: "If the improvements at issue would be covered by design immunity, and the [public] entity is therefore not liable for injuries caused by them, how could it make sense to hold the entity liable for the defendant's failure to warn of the same improvements?" Contrary to the City's assertions, however, we find nothing illogical in *Cameron*'s conclusion that section 830.6 was not intended to allow government entities to remain silent when they have notice that a reasonably approved design presents a danger to the public.

Moreover, the City has failed to identify any subsequent development in the law or other special justification that warrants departure from the doctrine of stare decisis. (See

2

*Samara v. Matar* (2018) 5 Cal.5th 322, 336 [" 'stare decisis' is 'a fundamental jurisprudential policy that prior applicable precedent usually must be followed' "]; *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 297 ["reexamination of precedent may become necessary when subsequent developments indicate an earlier decision was unsound"]; *Kisor v. Wilkie* (2019) __ U.S. __ [139 S.Ct. 2400, 2422] (*Kisor*) ["any departure from [stare decisis] demands 'special justification' — something more than 'an argument that the precedent was wrongly decided' "].) *Cameron* has been controlling law for over 50 years and the Legislature has never chosen to abrogate the holding. (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1213 (*Latimer*) [" 'Considerations of stare decisis have special force in the area of statutory interpretation, for here . . . [the Legislature] remains free to alter what we have done' "], italics omitted.) For all those reasons, we decline to overrule our prior precedent.

## I. BACKGROUND

### A. Accident and Complaint

On the afternoon of March 18, 2016, decedent Jonathan Tansavatdi was riding his bicycle on Hawthorne Boulevard in the City of Rancho Palos Verdes. Although most of Hawthorne Boulevard includes a bike lane, the bike lane stops at Dupre Drive (to the north) and then restarts after Vallon Drive (to the south). The block between Dupre and Vallon pitches sharply downhill in the southbound direction. The City chose not to provide a bike lane along this section of Hawthorne because it wanted to make space for street parking that provides access to an adjacent park. The parking spots end shortly before a right

turn lane at the intersection of Hawthorne and Vallon. The bike lane then resumes on Hawthorne, south of Vallon.

At the time of the accident, the decedent was traveling southward (downhill) along the right side of Hawthorne Boulevard. As he approached the intersection with Vallon Drive, the decedent rode his bicycle into the right turn lane but rather than turn right onto Vallon, he continued riding straight through the intersection. As the decedent was entering the intersection, an 80-foot tractor trailer began making a right turn from Hawthorne onto Vallon. Due to the length of the trailer, the truck started its turn from a southbound lane of Hawthorne, causing it to cut across the right turn lane at a perpendicular angle. The decedent collided with the truck and died from his injuries.

The decedent's mother, plaintiff Betsy Tansavatdi, filed a complaint against the City for "[d]angerous [c]ondition of [p]ublic [p]roperty pursuant to Government Code section 835." The complaint alleged that the intersection of Hawthorn Boulevard and Vallon Drive constituted a dangerous condition that the City had "created, or allowed to be created . . . under [section] 835." The complaint further alleged the City had provided "inadequate warning of dangerous conditions not reasonably apparent to motorists . . . for those driving through the road at the intersection of Hawthorne Boulevard and Vallon Drive."

## B. Trial Court Proceedings

### 1. *The City's motion for summary judgment*

The City filed a motion for summary judgment arguing that it had a "complete defense to [the] action for design immunity under Government Code section 830.6." In support of

the motion, the City submitted evidence showing that local officials had approved a repaving project along Hawthorne Boulevard in 2009. The plans showed a bike lane running along Hawthorne Boulevard that stopped at Dupre Drive and then restarted again at Vallon Drive. On the block between Dupre and Vallon, the plans showed parking spots in lieu of a bike lane, and a right turn lane at the intersection of Hawthorne and Vallon. A former city engineer provided a declaration explaining that the City had decided against including a bike lane on that block because it wanted to provide on-street parking for the benefit of an adjacent park.

The City also provided the declaration of a traffic engineering expert who had reviewed the 2009 repaving plans and concluded that they were reasonable and compliant with all applicable state and federal guidelines. The engineer also reviewed collision data that showed the decedent's accident was the only serious collision that had occurred at the intersection of Hawthorne Boulevard and Vallon Drive between 2006 to 2017. The expert opined that this data demonstrated the intersection had an "extremely good" collision record and was safe when used with due care.

The City argued that, considered together, its evidence established as a matter of law that it was entitled to judgment based on the defense of design immunity. In particular, the City argued the evidence showed the element of the roadway that had allegedly caused the decedent's accident — the absence of a bike lane between Dupre and Vallon — had been approved by authorized personnel and that substantial evidence supported the reasonableness of the design. Thus, the City contended, it could not be held liable under Government Code section 835 for any injury resulting from that alleged dangerous condition. In

a footnote, the City acknowledged Tansavatdi's complaint had also alleged an alternative theory of liability for "failing to warn of a dangerous condition."  In the City's view, however, because it had "met the requisites of design immunity, no such warning was required."

In opposition, Tansavatdi argued there were disputed questions of fact as to whether the design of the street qualified as a dangerous condition, contending that the City "should have ensured the roadway would be striped with a continuous . . . bicycle lane directing bicyclists approaching the intersection of Hawthorne and Vallon to the left of the right turn lane."  Tansavatdi also argued there were disputed issues whether the City was entitled to design immunity under Government Code section 830.6, arguing there was no evidence showing that the public employees who approved the repaving project on Hawthorne had authority to do so, or that the design was reasonable.

Citing *Cameron,* Tansavatdi separately argued that even if the City had demonstrated it was entitled to design immunity, that immunity did not apply to her claim that the City should have "warned of the dangerous condition . . . since it [was] not reasonably apparent to a bicyclist" and thus "create[d] a concealed trap."  Tansavatdi noted that the City's motion acknowledged the complaint had "pled this separate, independent theory [of dangerous conditions liability], negating any claimed design immunity."

In support of her opposition, Tansavatdi submitted an expert declaration opining that the discontinuation of the bike lane along the steeply pitched section of Hawthorne caused "bicyclists to ride their bicycles at relatively high speeds and

straight through the right turn lane at Vallon," thus increasing the risk of collision between cars and bicycles. The declaration further stated that to avoid the possibility of injury, "a bicyclist on Hawthorne between Dupre and Vallon needs more advanced warning and positive guidance for the safe and intended operation of the roadway."

In its reply, the City did not challenge Tansavatdi's assertion that *Cameron* had held that design immunity does not preclude a claim for failure to warn of a dangerous traffic condition. Instead, the City argued the evidence submitted in support of its motion showed that the section of roadway where the accident occurred had signs warning vehicles to reduce their speed. According to the City, this signage was sufficient to defeat any failure to warn claim. The City also contended that it would be "readily apparent" to bicycle riders that they should not travel straight through the right turn lane.

### 2. *The trial court's grant of summary judgment*

The trial court granted the motion for summary judgment, concluding that the City had established as a matter of law that it was entitled to design immunity under Government Code section 830.6. Specifically, the court found the evidence showed a "discretionary decision was made that street parking near the community park on Hawthorne Boulevard east of Dupre Drive had a higher priority than a bicycle lane near that particular stretch of Hawthorne Boulevard," and that the "plan and design were reasonable." The court's order made no mention of Tansavatdi's argument that design immunity did not preclude her alternative theory of liability for failure to warn of a dangerous traffic condition.

### C. The Court of Appeal Proceedings

As in the trial court, Tansavatdi argued on appeal that the City had failed to prove each of the elements necessary to establish design immunity. Tansavatdi also argued reversal was necessary because the trial court failed to address her alternative assertion that "design immunity '[does] not immunize [a government entity] for its concurrent negligence in failing to warn of the dangerous condition.' [Citation.] The evidence detailing the City's failure to warn of the concealed trap here precludes a finding that design immunity applies to shield the City of *all* liability."

Although the City's briefing focused on design immunity, it also responded to Tansavatdi's failure to warn claim. The City contended that even after *Cameron*, "a failure to warn claim cannot be based on a condition that is subject to design immunity; such a claim is only permissible when it involves something other than the approved design." According to the City, because "the absence of a bicycle lane from the stretch of Hawthorne at issue — and the presence of a lane at other parts of Hawthorne — was part of the approved plan," there could be no claim for failing to warn of that immunized design.

The Court of Appeal affirmed that the evidence supported a finding of design immunity, thus precluding any claim that the City was liable for having created a dangerous roadway condition by failing to provide a bike lane on the block between Dupre and Vallon. However, citing *Cameron,* the appellate court agreed with Tansavatdi that "design immunity does not, as a matter of law, preclude liability under a theory of failure to warn of a dangerous condition." (*Tansavatdi v. City of Rancho Palos Verdes* (2021) 60 Cal.App.5th 423, 441 (*Tansavatdi*).)

Because the trial court did not address the failure to warn claim in its order granting summary judgment, the court remanded for further proceedings on that issue.

The City filed a petition for review challenging the court's conclusion that design immunity does not bar Tansavatdi's claim for failure to warn. We granted review.

## II. DISCUSSION

### A. Standard of Review

The sole question presented in this case is whether the statutory defense of design immunity set forth in Government Code section 830.6[1] categorically precludes any claim that the public entity is liable for having failed to warn of a dangerous traffic condition resulting from that approved design. Because this issue involves a pure question of law, we apply a de novo standard of review.[2] (*People v. Rells* (2000) 22 Cal.4th 860, 870 ["pure question of law . . . is examined de novo"]; *Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 ["ruling on . . . summary judgment motion, and its resolution of the underlying statutory-construction issues, were subject to independent review"].)

---

[1] Unless otherwise noted, all further statutory citations are to the Government Code.

[2] We have no occasion to consider, and express no opinion on, several additional arguments the City raised in its motion for summary judgment that are unrelated to design immunity. Those additional arguments include, among other things, that the discontinuation of the bike lane does not qualify as either a " '[d]angerous condition' " (§ 830, subd. (a)) or a concealed trap (see § 830.8), and that Hawthorne Boulevard contains adequate signage to protect against any possible danger.

### B. Legal Background

#### 1. *Relevant provisions of the Government Claims Act*

##### a. *Government liability for dangerous conditions (§ 835)*

Under the Government Claims Act, a tort action cannot be maintained against a government entity unless the claim is premised on a statute providing for that liability. (See § 815.) In this case, plaintiff Tansavatdi brought her claims pursuant to section 835, which " 'is the principal provision addressing the circumstances under which the government may be held liable for maintaining a dangerous condition of public property.' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1131.) To establish liability under section 835, a plaintiff must show: "(1) 'that the property was in a dangerous condition at the time of the injury'; (2) 'that the injury was proximately caused by the dangerous condition'; (3) 'that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred'; and (4) either (a) that a public employee negligently or wrongfully 'created the dangerous condition' or (b) that '[the] public entity had actual or constructive notice of the dangerous condition a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.' " (*Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 716, quoting § 835, italics & fn. omitted.)

Thus, section 835 expressly authorizes two different forms of dangerous conditions liability: an act or omission by a government actor that *created* the dangerous condition (§ 835, subd. (a)); or, alternatively, failure "to protect against" dangerous conditions of which the entity had notice (*id.*, subd. (b)). The term "protect against" is statutorily defined to include,

among other things, "warning of a dangerous condition." (§ 830, subd. (b).)

### b. *Statutory immunities to dangerous conditions liability*

The Government Code also provides numerous statutory exceptions that limit liability for claims involving a dangerous condition. (See §§ 830.1–831.8.) Two of those exceptions are relevant here.

Section 830.6, commonly referred to as "design immunity," precludes liability for any injury caused by "the plan or design of . . . , or an improvement to, public property." (§ 830.6.) As we explained in *Cornette*, design immunity requires that a public entity establish three elements: "(1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design." (*Cornette, supra,* 26 Cal.4th at p. 69.) Resolution of the third element — the existence of substantial evidence supporting the reasonableness of the adoption of the plan or design — is a matter for the courts, not the jury, to decide. (See § 830.6 ["[T]he trial or appellate court" is to determine whether "there is any substantial evidence upon the basis of which . . . a reasonable public employee could have adopted the plan or design"].)

"The rationale for design immunity is to prevent a jury from second-guessing the decision of a public entity by reviewing the identical questions of risk that had previously been considered by the government officers who adopted or approved the plan or design. [Citation.] ' " '[T]o permit reexamination in tort litigation of particular discretionary decisions where

reasonable [people] may differ as to how the discretion should be exercised would create too great a danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested.' " [Citation.]' " (*Cornette, supra*, 26 Cal.4th at p. 69.)

Section 830.8 provides a second form of immunity, precluding public entity liability "for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code." (§ 830.8.) Section 830.8, however, sets forth a limitation to such immunity: "Nothing in this section exonerates a public entity . . . from liability for injury . . . caused by such failure if a signal, sign, marking or device . . . was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care."  This limitation to section 830.8 immunity is commonly referred to as the "concealed trap" exception.  (See *Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196–1197; *Callahan v. City and County of San Francisco* (1967) 249 Cal.App.2d 696, 704; see also Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 3.40, p. 253 (Van Alstyne) [immunity under § 830.8 "inapplicable when a warning sign . . . is necessary to warn of a concealed trap"].)[3]

---

[3]     As the Court of Appeal noted, at this stage of the proceedings "[i]t is unclear precisely what kind of warning [Tansavatdi] claims the city should have provided." (*Tansavatdi, supra*, 60 Cal.App.5th at p. 441, fn. 17).

### 2. *Relevant case law*

#### *a.* Flournoy v. State of California

As discussed below, our holding in *Cameron* is based largely on the analysis set forth in *Flournoy v. State of California* (1969) 275 Cal.App.2d 806 (*Flournoy*). Thus, to aid our understanding of *Cameron*, it is helpful to first consider *Flournoy*.

The plaintiffs in *Flournoy* brought a wrongful death action under section 835 alleging that the state had maintained a bridge in a dangerous condition. According to the complaint, the bridge had been designed in a manner that caused moisture to condense on the roadway, which then froze in cold weather resulting in icy conditions. The complaint further alleged that although the state had notice of numerous accidents caused by ice on the bridge, it had not posted any warning signs or redesigned the roadway surface. The trial court granted summary judgment based on design immunity (§ 830.6), concluding that " 'the condition [on] which plaintiff seeks to predicate liability was inherent in the design of the bridge.' " (*Flournoy, supra,* 275 Cal.App.2d at p. 810.)

The Court of Appeal reversed, holding that design immunity only addressed one of the two theories of dangerous

_____

Tansavatdi has consistently taken the position, however, that the warning she claims was necessary would fall within section 830.8 as a type of "traffic or warning signal[] . . . described in the Vehicle Code." (§ 830.8.) Because both parties have proceeded under the assumption that any possible warning regarding the bike lane would fall within section 830.8, we do the same. We express no opinion regarding the breadth of section 830.8 or how design immunity might affect failure to warn claims that do not involve a traffic condition.

conditions liability set forth in section 835: "The trial court erred in granting the summary judgment, for the state's [design immunity defense] could affect only one of two [alternative] theories of recovery . . . made by the pleadings . . . : (1) The state was liable under subdivision (a) of section 835, for it had created a dangerous condition by constructing an ice-prone bridge; and (2) the state was liable under subdivision (b) of section 835, for it had knowledge of a dangerously icy condition (not reasonably apparent to a careful driver) and failed to protect against the danger by posting a warning. Each of these theories postulated a separate, although concurring, cause of the accident. [Citation.] The first theory asserted causation in the state's active negligence in creating a danger, the second in the state's passive negligence in failing to warn of it." (*Flournoy, supra,* 275 Cal.App.2d at pp. 810–811.)

*Flournoy* explained that the distinct theories of liability set forth in section 835 subdivision (a) and subdivision (b) reflected the common law principle that a single defendant may produce "two concurring, proximate causes of an accident[:] . . . an affirmatively negligent act and . . . a passively negligent omission. . . . [¶] Here, . . . the complaint alleged active and passive negligence of a single defendant (the creation of a dangerous condition and the failure to post a warning of it) as separate, concurring causes. Regardless of the availability of the active negligence theory, plaintiffs were entitled to go before a jury on the passive negligence theory, i.e., an accident caused by the state's failure to warn the public against icy danger known to it but not apparent to a reasonably careful highway user." (*Flournoy, supra*, 275 Cal.App.2d at p. 811.)

The court also rejected the state's argument that section 830.6's design immunity provisions " 'prevail[]' over any liability

for a dangerous condition of public property under section 835," concluding that "[b]y force of its very terms the design immunity of section 830.6 is limited to a design-caused accident. [Citation.] It does not immunize from liability caused by negligence independent of design, even though the independent negligence is only a concurring, proximate cause of the accident." (*Flournoy, supra*, 275 Cal.App.2d at p. 811, fn. omitted.)

### b. Cameron v. State of California

In *Cameron, supra*, 7 Cal.3d 318, plaintiffs filed a complaint alleging the state was liable under section 835 for having negligently constructed an improperly banked "S" curve that left drivers unable to "negotiate the curve even though going at a lawful speed." (*Id*. at p. 322.) Plaintiffs separately alleged the state had failed to adequately warn of this defective design, contending that a sign warning drivers to slow their speed to 35 miles per hour would have been sufficient to neutralize the dangerous design. At the close of evidence, the trial court granted a motion for nonsuit based on design immunity.

On appeal, plaintiffs raised two arguments in support of reversal. First, they argued design immunity was inapplicable because the approved plans did not address the banking of the "S"-curve, which plaintiffs alleged was the dangerous condition that had caused the accident. Second, plaintiffs argued that "even if 'design immunity' . . . immunize[d] the state for negligence in the creation of the dangerous condition, the concurrent negligence by the state in failing to warn of the dangerous condition provides an independent basis for recovery." (*Cameron, supra*, 7 Cal.3d at p. 322.) Plaintiffs

contended that because the state had provided no evidence that this "negligent failure to warn" was "the result of any design or plan which would confer immunity under section 830.6", such conduct provided a separate "basis for recovery, even if the dangerous condition itself was created as a result of a plan covered by section 830.6." (*Id.* at p. 327.)

We agreed with both arguments. Regarding the first issue, we found the state had presented no evidence that the curve's banking was part of the design approved by the public entity, and thus there was "no basis for concluding that any liability for injuries caused by this [alleged defect] was immunized by section 830.6." (*Cameron, supra*, 7 Cal.3d at p. 326, fn. omitted.) Although that conclusion was sufficient to reverse the trial court's judgment of nonsuit, we went on to consider plaintiffs' second argument that, even if proven, design immunity would not preclude their claim for failing to warn motorists about the dangerous curve. We explained that addressing this alternative claim was necessary "[f]or the guidance of the trial court" (*id.* at p. 326) because it was possible "upon remand that the state could produce evidence to show that the [banking] was [part of the approved design]. In that event, plaintiffs' second contention would become determinative on the issue of design immunity." (*Id.* at p. 327, fn. 11.)

We began our analysis of the failure to warn claim by noting that while section 830.8 generally immunizes liability for injuries caused by the failure to provide traffic or warning signals, the statute allows public entity liability "if a sign was necessary to warn of a dangerous condition which would not be reasonably apparent to, and would not have been anticipated by, a person using the highway with due care." (*Cameron, supra*, 7 Cal.3d at p. 327.) We further held that plaintiffs had

16

introduced sufficient evidence to support a finding "that warning signs, indicating the proper speed to negotiate the curve, . . . would eliminate the dangerousness from the condition of uneven [banking]." (*Ibid.*)

Turning to whether section 830.6's design immunity provision precluded plaintiffs' claim for failure to warn, we summarized *Flournoy* at length, and in particular its discussion of active versus passive negligence. (*Cameron, supra*, 7 Cal.3d at pp. 327–328.) We ultimately "[a]gree[d] with the reasoning and conclusions of *Flournoy*" (*id.* at p. 328), and held that, as in that case, plaintiffs had alleged "active negligence . . . (the creation of the dangerous condition, namely [improper banking]) and passive negligence (failure to warn of the dangerous condition) of . . . the state." (*Ibid.*) We further held that, "as in *Flournoy*, the passive negligence alleged is independent of the negligent design" and that plaintiffs were therefore "entitled to go to the jury on the passive negligence theory." (*Id.* at pp. 328–329.)

We then "recapitulate[d]" our holding, explaining that "where the state is immune from liability for injuries caused by a dangerous condition of its property because the dangerous condition was created as a result of a plan or design which conferred immunity under section 830.6, the state may nevertheless be liable for failure to warn of this dangerous condition where the failure to warn is negligent and is an independent, separate, concurring cause of the accident." (*Cameron, supra*, 7 Cal.3d at p. 329.)

## C. Analysis

To resolve the legal question presented in this case, we must answer three questions involving *Cameron*. First, we

must determine whether the Court of Appeal correctly interpreted *Cameron* as holding that "design immunity for a dangerous condition [does] not necessarily shield the state from liability for a failure to warn of the same dangerous condition." (*Tansavatdi, supra*, 60 Cal.App.5th at p. 442.) Second, assuming the interpretation was correct, we must address the City's assertion that *Cameron*'s analysis regarding failure to warn claims does not constitute binding precedent or has otherwise been impliedly displaced by subsequent events. And third, to the extent the Court of Appeal properly interpreted *Cameron* and the decision is binding precedent, we must decide whether there is an adequate justification to depart from the doctrine of stare decisis and overrule our prior holding.

### 1. The breadth of Cameron*'s holding*

#### a. The Court of Appeal correctly interpreted Cameron

The first question we must resolve is whether the Court of Appeal correctly interpreted *Cameron* as permitting failure to warn claims that involve an immunized element of a design decision. Several other courts have adopted a similar reading of *Cameron*. (See *Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 945 ["[t]he failure to warn of a trap can constitute independent negligence, regardless of design immunity"]; *Hefner v. County of Sacramento* (1988) 197 Cal.App.3d 1007, 1017, abrogated on another ground in *Cornette, supra*, 26 Cal.4th 63; *Levine v. City of Los Angeles* (1977) 68 Cal.App.3d 481, 488; *Anderson v. City of Thousand Oaks* (1976) 65 Cal.App.3d 82, 91 (*Anderson*) ["In spite of respondent's immunity for a defectively designed roadway, a second independent ground of liability under subdivision (b) of Government Code section 835 exists for its failure to warn of the

dangerous condition if it had actual or constructive notice of such a condition"]; see also Van Alstyne, *supra*, § 3.40 at p. 253 [*Cameron* and other authorities support the proposition that "even if the source of the danger is inherent in the approved plan or design of the improvement, and therefore appears to be nonactionable under the 'design immunity,' the entity's failure to pose adequate warning signs may result in liability"].)

The City, however, argues we should follow the analysis of *Weinstein v. Department of Transportation* (2006) 139 Cal.App.4th 52 (*Weinstein*), which adopted a substantially narrower interpretation of *Cameron.* The plaintiffs in *Weinstein* alleged that a freeway " 'lane drop' " (the discontinuation of a lane) created a dangerous traffic condition and that defendant had failed to properly warn of that condition. (*Id.* at p. 54.) The trial court granted summary judgment based on design immunity. On appeal, the court rejected plaintiffs' contention that "defendant's design immunity defense did not bar them from recovering for defendant's failure to post" sufficient warnings about the lane drop. (*Id.* at p. 61.) The appellate court explained that " '[i]t would be illogical to hold that a public entity immune from liability because the design was deemed reasonably adoptable, could then be held liable for failing to warn that the design was dangerous.' [Citation.] Since defendant could not be held liable for these aspects of the roadway's design as dangerous conditions, it could not be held liable for failing to warn of these same aspects." (*Ibid.*) *Weinstein* further explained that its holding was not in conflict with *Cameron.* According to the court, "*Cameron* involved the failure to warn of a hidden dangerous condition that was not part of the approved design of the highway. [Citation.] Here, plaintiffs claim that defendant was obligated to warn of

conditions that were part of the approved design." (*Weinstein,* at p. 61, italics omitted.)

The Court of Appeal here found that *Weinstein*'s reading of *Cameron* was "mistaken." (*Tansavatdi, supra*, 60 Cal.App.5th at p. 442.) We agree. As noted above, our decision in *Cameron* expressly held that if the state were able to establish on remand that the challenged condition at issue in that case (the banking of the "S" turn) was part of the approved highway plans, and thus subject to design immunity, that immunity would *not* defeat plaintiffs' alternative claim that the state's failure to warn drivers of the known danger was an independent, intervening cause of the accident. Contrary to *Weinstein*, there is no language in *Cameron* suggesting that our holding was only intended to apply when a failure to warn claim challenges a road condition "that was not part of the approved design." (*Weinstein, supra*, 139 Cal.App.4th at p. 61.) Indeed, such a limitation is in direct conflict with *Cameron's* conclusion that if the defendant were able to produce evidence on remand demonstrating that the banking of the curve *was part of the approved plan* (thus precluding any claim for having created that dangerous condition), plaintiffs would nonetheless remain entitled to move forward with their failure to warn claim. (See *Cameron, supra*, 7 Cal.3d at pp. 326–327 & fn. 11.) Accordingly, we disapprove that portion of *Weinstein v. Department of Transportation*, *supra*, 139 Cal.App.4th 52.[4]

---

[4] We likewise disapprove language in *Compton v. City of Santee* (1993) 12 Cal.App.4th 591, suggesting that design immunity categorically precludes claims alleging failure to warn of a dangerous traffic condition created by the immunized

*b.* Cameron's *limitations on failure to warn claims*

While we agree with the Court of Appeal's determination that *Weinstein* misread *Cameron*, for the guidance of our courts we think it helpful to clarify additional aspects of *Cameron*'s analysis that affect the requirements necessary to prevail on a claim alleging failure to warn of a dangerous traffic condition.

First, as noted above, *Cameron* expressly adopted both the reasoning and the conclusions set forth in *Flournoy*. (See *Cameron, supra,* 7 Cal.3d at p. 328.) *Flournoy*, in turn, made clear that its conclusion that design immunity does not categorically preclude failure to warn claims was based on the two distinct grounds for dangerous conditions liability set forth in section 835: liability for injuries caused by a dangerous condition that a public entity *created* (§ 835, subd. (a)); and liability for failing to protect against a dangerous condition of which the public entity had notice (*id.*, subd. (b).) *Flournoy* further reasoned that these two distinct theories of liability incorporated the "active" and "passive" theories of negligence recognized in the common law. (See *Flournoy, supra,* 275 Cal.App.2d at pp. 810–811.) Thus, under *Flournoy* and *Cameron*, section 830.6 immunizes liability for having created a dangerous traffic condition under section 835, subdivision (a) (a form of active negligence) but does not necessarily immunize liability for failing to warn of a known dangerous traffic condition under section 835, subdivision (b) (a form of passive

---

design. (See *id.* at p. 600.) Although decided many years after *Cameron*, the *Compton* court failed to address our holding in any way.

negligence).[5]   This distinction is important because unlike claims brought under section 835, subdivision (a), to prevail on a claim under subdivision (b), the plaintiff must prove the public entity *had notice* of the dangerous condition.  (See § 835, subds. (a), (b); compare Van Alstyne, *supra*, § 3.17, at p. 208 ["[w]hen the alleged basis of entity liability for a dangerous property condition is . . . creation of the condition [under § 835, subd. (a)], plaintiff is not required to establish . . . notice to the entity"]; with *id.* at § 3.20, p. 212 [when alleged basis of entity liability is failure to protect under § 835, subd. (b), plaintiff's "failure to establish . . . notice is fatal to recovery"].)  Accordingly, a plaintiff seeking to impose liability for failure to warn of an immunized design element must prove the public entity had notice that its design resulted in a dangerous condition.  (See, e.g., *Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 829 [public entity "could not be liable under section 835, subdivision (b)" where "there was no evidence that [it] had notice

---

[5]   The City argues the reasoning of *Cameron* and *Flournoy* are flawed because they incorporate "common law negligence concepts" — namely active versus passive negligence — when interpreting public entity liability for dangerous conditions.  The City contends this analysis conflicts with subsequent case law clarifying that "public entity liability for dangerous property conditions must be based on Government Code section 835, rather than common law negligence."  The City's argument, however, overlooks that *Cameron* and *Flournoy*'s discussion of active and passive negligence was rooted in the statutory language of section 835, with subdivision (a) incorporating the concept of active negligence and subdivision (b) incorporating the concept of passive negligence.  In other words, *Cameron* did not find that public entities can be held liable for failure to warn based on common law principles of active versus passive negligence, but rather found that section 835 incorporates those common law principles.

of the allegedly dangerous condition"]; *Anderson, supra*, 65 Cal.App.3d at p. 92 [discussing notice requirement of claims arising under section 835, subdivision (b)].)

Second, while *Cameron* held that design immunity does not categorically preclude claims alleging failure to warn of a dangerous traffic condition pursuant to section 835, subdivision (b), the decision's reasoning also makes clear that such claims may be subject to a separate, more limited form of statutory immunity: Signage immunity set forth in section 830.8. That provision precludes government liability for failing to provide "traffic or warning signals" (§ 830.8), except when "necessary to warn of a dangerous condition which would not be reasonably apparent to, and would not have been anticipated by, a person using the highway with due care" (*Cameron, supra*, 7 Cal.3d at p. 327). As noted above, this exception to signage immunity is known as the "concealed trap" exception. (See *ante*, at p. 12.) Thus, under *Cameron*, despite the inapplicability of design immunity, a plaintiff alleging failure to warn of a dangerous traffic condition must nonetheless overcome signage immunity by establishing the accident-causing condition was a concealed trap.

Third, *Cameron* makes clear that to establish liability for failing to warn of a dangerous traffic condition that is otherwise subject to design immunity, the plaintiff must prove the absence of a warning was an "independent, separate, concurring cause of the accident." (*Cameron, supra*, 7 Cal.3d at p. 329.) We have previously observed that "[i]n cases where concurrent independent causes contribute to an injury, we apply the 'substantial factor' test" (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352, fn. 12), which requires the plaintiff to "show some substantial link or nexus

between omission and injury." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 778.) Thus, if a plaintiff is not able to establish that the absence of a warning sign was a substantial factor in causing the injury, the claim will fail.

Finally, we note that while *Cameron* concluded a public entity can be held liable for failing to warn of a dangerous roadway feature that was the result of a properly approved design, our decision did not address whether design immunity might apply if the public entity is able to show that the presence or absence of warning signs was part of the approved design. The plaintiffs in *Cameron* specifically alleged that the state's failure to warn was *not* part of any approved plan (*id.* at p. 326), and they acknowledged in their petition for review that section 830.6 might apply "where the presence or absence of signs was a considered element of the plan or design."[6] In this case, the City's summary judgment motion argued only that section 830.6 shields public entities from failure to warn claims involving an approved feature of the roadway; the City did not argue that the evidence offered in support of its design immunity defense showed city officials had considered whether to provide a warning about the discontinuance of the bike lane. Thus, as in *Cameron*, we have no occasion to consider, and express no view on, how design immunity might affect a failure to warn claim when a public entity does produce evidence that it considered whether to provide a warning.

---

[6] We granted Tansavatdi's request that we take judicial notice of the petition for review that the plaintiffs filed in *Cameron* as well as a 1978 Staff Report prepared by the Joint Committee on Tort Liability. That staff report is discussed in more detail below. (See *post,* at pp. 30–31.)

The above discussion illustrates that while *Cameron* generally permits claims for failure to warn of a dangerous traffic condition that is subject to design immunity, a plaintiff pursuing such a claim must nonetheless prove various elements that are not present when pursuing a claim alleging a public entity *created* that dangerous condition: (1) the public entity had actual or constructive notice that the approved design resulted in a dangerous condition (see §§ 835, subd. (b) & 835.2 [defining "notice" within the meaning of § 835, subd. (b)]); (2) the dangerous condition qualified as a concealed trap, i.e., "would not [have been] reasonably apparent to, and would not have been anticipated by, a person exercising due care" (§ 830.8); and (3) the absence of a warning was a substantial factor in bringing about the injury.

### 2. Cameron *constitutes binding precedent*

Having clarified the breadth of our holding in *Cameron,* we next consider the City's arguments that *Cameron*'s discussion of failure to warn claims is nonbinding dicta or, alternatively, no longer remains good law due to an intervening amendment to section 830.6.

#### a. Cameron'*s discussion of the plaintiffs' failure to warn claim is not dicta*

The City argues that *Cameron*'s discussion of the plaintiffs' failure to warn claim is properly construed as nonbinding "dictum" insofar as the discussion was only provided " '[f]or the guidance of the trial court on remand' " in the event the state was able to prove on remand that the banking of the curve was an approved aspect of the plan. This argument is without merit.

We have previously held that "[s]tatements by appellate courts 'responsive to the issues raised on appeal and . . . intended to guide the parties and the trial court in resolving the matter following . . . remand' are not dicta." (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158.)  *Cameron* expressly clarified why we elected to address the failure to warn claim at issue in that case, explaining that if the state was able to produce evidence showing the banking of the "S" turn was part of the approved design, "plaintiffs' second contention" — i.e., their failure to warn claim — "would become determinative on the issue of design immunity." (*Cameron, supra*, 7 Cal.3d at p. 327, fn. 11.)  Under established law, our analysis of the plaintiffs' failure to warn claim is not dicta.

### b. *The 1979 amendments to section 830.6 did not abrogate* Cameron

The City next argues that even if *Cameron* held that design immunity does not preclude failure to warn claims, the holding is no longer good law in light of amendments the Legislature made to section 830.6 in 1979 (seven years after *Cameron* was decided).  Those amendments describe the circumstances under which government entities can retain design immunity when changed circumstances have rendered the original design no longer safe.

To understand this argument, further background discussion regarding the 1979 amendments is necessary.  When originally enacted in 1963, section 830.6 did not contain any provision explaining whether, once obtained, design immunity could ever be lost.  Although we initially interpreted the absence of any such provision to mean design immunity continued regardless of any subsequent change in conditions (see *Cornette, supra*, 26 Cal.4th at pp. 69–70 [discussing history of § 830.6]),

we overruled those decisions in *Baldwin v. State of California* (1972) 6 Cal.3d 424 (*Baldwin*), which held that section 830.6's statutory immunity is lost when "the actual operation of the plan or design over a period of time and under changed circumstances discloses that the design has created a dangerous condition of which the entity has notice." (*Baldwin,* at p. 431.)

In 1979, the Legislature responded to *Baldwin* by adopting Assembly Bill No. 893 (1979–1980 Reg. Sess.) (Assembly Bill 893), which amended section 830.6 to "specify the circumstances under which a public entity retains its design immunity despite having received notice that the plan or design has become dangerous because of a change of physical conditions." (*Cornette, supra*, 26 Cal.4th at p. 71.) Those amendments added the following language to section 830.6:

> Notwithstanding notice that constructed or improved public property may no longer be in conformity with [an approved] plan or design . . . , the immunity provided by this section shall continue for a reasonable period of time sufficient to permit the public entity to obtain funds for and carry out remedial work necessary to allow such public property to be in conformity with [the approved plan] . . . . In the event that the public entity is unable to remedy such public property because of practical impossibility or lack of sufficient funds, the immunity provided by this section *shall remain so long as such public entity shall reasonably attempt to provide adequate warnings of the existence of the condition not conforming to the approved plan or design or to the approved standard.* (Italics added.)

As we discussed in *Cornette,* the legislative history of Assembly Bill 893 makes clear the amendments were intended to both codify *Baldwin*'s conclusion that design immunity can be lost due to changed circumstances while also softening the financial ramifications of such a rule by allowing public entities "a reasonable time to finance and take remedial action or to provide adequate warning of the dangerous condition." (*Cornette,* at p. 72.)

The City argues the 1979 amendments undermine *Cameron* because the statute now expressly describes the limited circumstances under which design immunity does not preclude a failure to warn claim: When the public entity has notice that the originally approved plan or design has become dangerous because of a change in physical conditions but takes no remedial action. The City contends that because section 830.6 now specifically states when an entity must warn of the dangers associated with a design, *Cameron* no longer controls. The City further contends that the amendments create a conflict between *Cameron*, which holds that design immunity does not extend to claims alleging the failure to warn of an approved design element, and the statutory language of section 830.6, which indicates that a warning is necessary *only* when changed circumstances have rendered the original design dangerous. In the City's view, because plaintiff has never argued that a change in physical conditions rendered the original design of the roadway dangerous, any claim for failure to warn necessarily fails.

We are not persuaded. As noted above, the legislative history demonstrates that the 1979 amendments were intended to mitigate the financial effects of *Baldwin*'s holding that design immunity can be lost when "the plan or design has become

dangerous *because of a change of physical conditions*." (*Cornette, supra,* 26 Cal.4th at p. 71, italics added.) *Cameron*, in contrast, addresses whether design immunity applies to failure to warn claims *irrespective* of changed circumstances. Indeed, in the claims at issue in *Cameron*, there was no allegation that the challenged design feature (the banking of the turn) had become dangerous as the result of changed physical conditions, but rather that the design of the roadway was dangerous from its inception, and that a warning would have mitigated the problem. Thus, *Cameron* allows plaintiffs to seek redress for injuries where the public entity has notice that an approved design has resulted in a concealed traffic danger and a warning would have protected against that danger. The 1979 amendments do not speak to that specific situation.

The legislative history lends clear support to the conclusion that the 1979 amendments were unrelated to *Cameron*. In January 1979, the Joint Committee on Tort Liability, chaired by assemblyman John Knox, issued a staff report recommending that the Legislature amend section 830.6 in two distinct ways: (1) add language to the statute that would limit the financial impacts of *Baldwin*, *supra*, 6 Cal.3d 424; and (2) "obviate[] [*Cameron*'s] holding" that a public entity can be held liable for failing to warn of a dangerous design element "even though design immunity may have been applicable." (Joint Com. on Tort Liability, 1978 Staff Report on Tort Liability (Jan. 1979) p. 78-257.)

In the 1979 amendments that followed, however, the Legislature made the recommended changes in response to *Baldwin* but took no action to abrogate *Cameron*. Indeed, in a letter that Assemblyman Knox (who both authored Assembly Bill 893 and chaired the Joint Committee on Tort Liability) sent

29

to then Governor Edmund J. Brown, Jr., Knox explained that
" '[a]lthough the staff of the Joint Committee agreed with
*Baldwin*, it felt there should be some recognition of the practical
limitations which have been imposed upon governments by
Article XIII A of the California Constitution (Proposition 13) and
ever increasing liability insurance costs. This recognition is
achieved by AB 893.' " (*Cornette, supra*, 26 Cal.4th at p. 72,
quoting Assemblyman John T. Knox, letter to Governor
Edmund G. Brown, Jr., re Assem. Bill No. 893, Aug. 30, 1979,
pp. 1–2; see also *Cornette*, at p. 72 ["Although referenced
elsewhere in several legislative analyses, the purpose of the
[1979 amendment] was best explained by its author
[Assemblyman Knox] in a letter to the Governor urging him to
approve it"]; *Martin v. Szeto* (2004) 32 Cal.4th 445, 450–451
[statements from a bill's sponsor "are entitled to consideration
to the extent they constitute 'a reiteration of legislative
discussion and events leading to adoption of proposed
amendments rather than merely an expression of personal
opinion' "].) The letter contains no reference to *Cameron*. This
history supports the view that the amendments to section 830.6
were intended to address how changed circumstances affect
design immunity, not *Cameron*'s holding regarding how design
immunity affects failure to warn claims.[7]

---

[7] In an answer brief filed in response to amicus Consumer
Attorneys of California, the City has also argued that regardless
of what *Cameron* may have concluded about design immunity's
application to failure to warn claims brought pursuant to section
835, subdivision (b), our subsequent decision in *Cornette, supra*,
26 Cal.4th 63, "squarely held that design immunity" *does* apply
to claims arising under subdivision (b). In support, the City cites

### 3. Adherence to stare decisis

Finally, we address the City's contention that even if *Cameron* remains binding precedent, we should overrule the decision and hold that design immunity precludes any claim alleging that a public entity failed to warn of a dangerous roadway condition that was reflected in the approved plans. "It is, of course, a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices." (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 503–504.) "Accordingly, a party urging us to overrule a precedent faces a rightly onerous

---

language from *Cornette* that states: "Section 835, subdivision (b) provides that a public entity is liable for injury . . . caused by a dangerous condition of its property if the . . . public entity had actual or constructive notice of the condition a sufficient time before the injury to have taken preventive measures. . . . [¶] However, under section 830.6, the public entity may escape such liability by raising the affirmative defense of 'design immunity.'" (*Cornette*, at pp. 68–69, fn. omitted.)

Although this isolated passage is arguably in tension with some of our discussion in *Cameron*, we find it notable that *Cornette* did not involve a claim for failure to warn nor did it discuss *Cameron*'s treatment of failure to warn claims. Instead, the plaintiff in *Cornette* claimed loss of design immunity based on changed physical circumstances. Moreover, *Cornette*'s brief reference to section 835, subdivision (b) was of only marginal relevance to the legal issue presented in that case, which was whether section 830.6 requires that every element of design immunity should be decided by the court rather than the jury. (See *Cornette, supra*, 26 Cal.4th at pp. 66–67.) We find nothing in *Cornette* suggesting that our brief reference to section 835, subdivision (b) was intended to modify or otherwise overrule our holding in *Cameron*, which had been binding precedent at that time for over thirty years.

task." (*Trope v. Katz* (1995) 11 Cal.4th 274, 288 (*Trope*); see also *Kisor, supra,* 139 S.Ct. at p. 2422] ["any departure from [stare decisis] demands 'special justification' "].) That burden is even greater where, as here, " 'the Court is asked to overrule a point of statutory construction. Considerations of stare decisis have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and [the Legislature] remains free to alter what we have done.' " (*Latimer, supra,* 5 Cal.4th at p. 1213, italics omitted.)

### a. Cameron*'s reasoning is not "illogical"*

The City argues we should depart from stare decisis because *Cameron*'s holding is "illogical" insofar as it takes away the very immunity that section 830.6 is intended to provide: "If the improvements at issue would be covered by design immunity, and the entity is therefore not liable for injuries caused by them, how could it make sense to hold the entity liable for the defendant's failure to warn of the same improvements? The injuries would still be caused by the same dangerous condition: the improvements."

Contrary to the City's suggestion, we find nothing illogical in *Cameron*'s conclusion that while section 830.6 shields public entities from liability for the design of the physical features of a roadway, those entities retain a duty to warn of known dangers that the roadway presents to the public. At its core, *Cameron* held that if a warning would have "effectually neutralized" (*Cameron, supra,* 7 Cal.3d at p. 329) the risks associated with a dangerously designed roadway, the absence of such a warning qualifies as an *independent* cause of the injury. Stated differently, if a warning would have "eliminate[d] the

dangerousness" (*id.* at p. 327) of the approved design, the failure to extend such a warning is a distinct cause of the accident that is separate from the design itself, and thus not subject to section 830.6. That reasoning is evident in *Cameron*, where the court found that the plaintiffs had introduced sufficient evidence to support a finding that any danger arising from the design of the curve would have been mitigated by a sign that warned drivers to slow down their speed. (See *ibid.* ["plaintiffs have introduced sufficient evidence to show that . . . warning signs . . . , if obeyed by the driver, would eliminate the dangerousness from the condition of uneven [banking]"]; *id.* at p. 329 ["if there had been proper warning of a dangerous curve and posting of the safe speed, the dangerous condition of the highway would have been effectually neutralized"].)

Indeed, *Cameron*'s conclusion that a government entity cannot simply remain silent when it has notice that a reasonably approved design presents a danger to the public (see § 830.8), closely mirrors how we (and our Legislature) have treated design immunity in the context of changed circumstances. In *Baldwin, supra,* 6 Cal.3d 424, we held that when a public entity has notice that changed physical conditions have caused an approved design to become dangerous in operation, the entity "must act reasonably to correct or alleviate the hazard." (*Id.* at p. 434.) Concluding that design immunity was never intended to be "absolute" (*id.* at p. 433), we explained that while section 830.6 protects a public entity's initial design decision, the entity nonetheless remains " 'under a continuing duty to review its plan in the light of its actual operation.' " (*Baldwin*, at p. 433, quoting *Weiss v. Fote* (N.Y. Ct.App. 1960) 167 N.E.2d 63, 67; see *Baldwin,* at p. 434 ["Having approved the plan or design, the governmental entity may not, ostrich-like, hide its head in the

blueprints, blithely ignoring the actual operation of the plan"].) In response to concerns that permitting the loss of design immunity would "forc[e] [public entities] to spend vast sums of money to update hazardous or obsolescent public improvements" (*id.* at p. 436), we noted that "[i]n many cases, inexpensive remedies, such as warning signs . . . will be sufficient" (*id.* at p. 437). The Legislature's subsequent 1979 amendments to section 830.6 were intended to codify *Baldwin*'s approach to design immunity, while making clear that governments can retain immunity by providing a warning in lieu of remedying the design defect. (See *ante*, at pp. 26–31.)

While *Baldwin* and the 1979 amendments addressed how design immunity can be retained or lost when changed circumstances have rendered an approved design dangerous, *Cameron*'s conclusion that section 830.6 does not bar claims for failing to warn of a dangerous design element employs similar logic. Under *Cameron*'s approach, section 830.6 operates to protect a public entity's discretionary design decisions but does not permit it to remain silent when it has notice that an element of the road design presents a concealed danger to the public. And much like section 830.6's treatment of loss of design immunity, *Cameron* does not compel public entities to engage in costly remediation projects or redesign roadways to avoid the danger in question; it merely compels the government to provide warnings about dangers of which it has notice. Stated differently, *Cameron* recognizes that a design might be the best engineers can do under the circumstances but still leave foreseeable dangers that can and should be addressed through appropriate warnings.

In sum, we find nothing illogical about interpreting sections 830.6 and 835 in a manner that compels government

entities to provide a warning when they know (or should know) that an approved roadway design presents concealed dangers to the public. Indeed, as argued by amicus curiae, "[A] contrary rule would effectively allow public entities to withhold . . . warnings for known hazards despite [repeated injuries or even deaths]. . . . [I]t [disserves] . . . public policy to allow governmental entities to consciously disregard known, ongoing hazards to the public."[8]

### b. *Factors supporting stare decisis*

In addition to *Cameron* being well reasoned, several other factors support application of stare decisis. Our unanimous decision in *Cameron* is over 50 years old. (See *Trope, supra,*

---

[8] The City also argues that *Cameron* was poorly reasoned insofar as it concluded that the "concealed trap exception" set forth in section 830.8's signage immunity provision also creates an exception to the general rule of design immunity set forth in section 830.6. As stated in the City's briefing, "To hold that section 830.8's exception to one immunity trumps a different and broader immunity is illogical."

This argument, however, misconstrues *Cameron*'s reasoning as to why design immunity does not categorically preclude claims for failure to warn. As discussed above, we do not read *Cameron* as having concluded that the concealed trap exception in section 830.8 also creates an exception to section 830.6's design immunity provision. Instead, *Cameron*'s holding was based on the distinct theories of dangerous conditions liability set forth in section 835 subdivision (a) (creating a dangerous condition) and subdivision (b) (failing to protect against a known dangerous condition). (See *ante*, at pp. 15–17, 21–22.) *Cameron* reasoned that while design immunity shields public entities from liability for having created a dangerous condition (see § 835, subd. (a)), design immunity does not necessarily shield such entities from having failed to warn against dangerous condition of which it had notice. (See § 835, subd. (b).)

11 Cal.4th at p. 288 [citing "age of the precedent" as factor in evaluating stare decisis]; *People v. Shea* (1899) 125 Cal. 151, 153; see also *Woollacott v. Meekin* (1907) 151 Cal. 701, 705 [noting prior opinion was unanimous in applying stare decisis].) While some decisions have suggested that design immunity continues to preclude most forms of failure to warn claims, the weight of authority has long understood *Cameron* to preserve such claims. (See *ante*, at pp. 18–21; 9 Witkin, Cal. Proc. (6th ed. 2023) Appeal, § 536 ["The long acceptance of a rule by the courts, as where it is followed in other cases, . . . is a potent argument in favor of allowing it to stand"].) Moreover, on the record before us, there has been no showing that *Cameron* has broadly impacted government liability for dangerous conditions or gravely undermined design immunity. (*Cf. Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 875 [overruling prior precedent that was shown to be "having a broad impact"].) That is not particularly surprising given that, as discussed above, *Cameron* leaves in place substantial barriers for parties who seek to impose liability for failing to warn of an immunized roadway design element. (See *ante*, at pp. 21–25.)

Finally, it bears emphasizing that *Cameron* involves a question of statutory interpretation, which leaves the Legislature free to abrogate the holding through amendment of the Government Claims Act. (See *Latimer, supra,* 5 Cal.4th at p. 1213 [" 'Considerations of stare decisis have special force in the area of statutory interpretation, for here . . . Congress remains free to alter what we have done' "]; *Halliburton Co. v. Erica P. John Fund, Inc.* (2014) 573 U.S. 258, 274.) The fact that the Legislature has never elected to address *Cameron* is particularly persuasive in light of legislative history showing that it was directly asked to do so. As discussed above, that

history shows the Legislature previously chose to follow a legislative committee's recommendation to amend section 830.6 in response to *Baldwin, supra,* 6 Cal.3d 424, but it declined the commission's further recommendation to amend the statute to abrogate *Cameron.* (See *ante*, at pp. 29–31.) While the City correctly notes that "legislative inaction alone does not necessarily imply legislative approval" (*Latimer,* at p. 1213), the fact that *Cameron* was brought to the attention of the Legislature, and the Legislature thereafter modified section 830.6 without addressing *Cameron*, further bolsters our decision to follow the principles of stare decisis. (See 9 Witkin, Cal. Proc. (6th ed. 2023) Appeal, § 537 ["Another justification frequently advanced for following a precedent is that . . . the Legislature has not seen fit to change it by statute. [¶] . . . [¶] Much strength is added to this factor where it further appears that the Legislature modified or reenacted a statute without changing the provision as previously construed"].) If the Legislature ultimately comes to agree with the City that design immunity should likewise preclude all claims asserting that the public entity failed to warn of dangers resulting from approved elements of a roadway design, it can act accordingly.[9]

---

[9] The Department of Transportation, acting as amicus curiae for the City, notes that courts have interpreted other statutory immunities that contain language similar to section 830.6 to preclude failure to warn claims. (See, e.g., *Arroyo v. State of California* (1995) 34 Cal.App.4th 755, 760 [language in § 831.2 that precludes liability for "an injury caused by a natural condition of any unimproved public property" extends to claims alleging failure to warn of a dangerous natural condition].) Although we decline to overrule *Cameron* based on the principle of stare decisis, we express no opinion whether its reasoning can

## III.  DISPOSITION

The Court of Appeal's judgment is affirmed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

**GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**EVANS, J.**

---

or should be extended to other statutory immunities set forth in the Government Code that pertain to dangerous conditions liability.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Tansavatdi v. City of Rancho Palos Verdes

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 60 Cal.App.5th 423
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S267453
**Date Filed:** April 27, 2023

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Robert Broadbelt III

_____

**Counsel:**

Mardirossian & Associates; Mardirossian Akaragian, Garo Mardirossian, Armen Akaragian, Adam Feit; The Linde Law Firm, Douglas A. Linde, Erica A. Gonzales; Esner, Chang & Boyer, Holly N. Boyer, Shea S. Murphy; Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiff and Appellant.

Singleton Schreiber McKenzie & Scott and Benjamin I. Siminou for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Wesierski & Zurek, Frank J. D'Oro, David M. Ferrante-Alan; Pollak, Vida & Barer, Daniel P. Barer and Anna L. Birenbaum for Defendant and Respondent.

Hanson Bridgett, Alexandra V. Atencio, Adam W. Hofmann and David C. Casarrubias for League of California Cities, California State Association of Counties, California Special Districts Association, California Association of Joint Powers Authorities and Independent

Cities Risk Management Authority as Amici Curiae on behalf of Defendant and Respondent.

Erin E. Hollbrook, Alan M. Steinberg, Joann Georgallis, Judith A. Carlson and Brandon S. Walker for California Department of Transportation as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeffrey I. Ehrlich
Ehrlich Law Firm
237 West Fourth Street, Second Floor
Claremont, CA 91711
(909) 625-5565

Daniel P. Barer
Pollak, Vida & Barer
11500 West Olympic Boulevard, Suite 400
Los Angeles, CA 90064
(310) 551-3400